UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JOSEPH DURHAM,

      Petitioner,

v.                                  Case No. 5:20-cv-240-JLB-PRL

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS AND
FLORIDA ATTORNEY GENERAL,

      Defendants.

---

## ORDER

      Joseph Durham ("Petitioner"), a prisoner in the custody of the Florida Department of Corrections, petitions this Court, through counsel, for a writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. 1; Doc. 15.)  Respondent, Secretary, Florida Department of Corrections ("Respondent"), filed a response, and Petitioner filed a reply.  (Doc. 21; Doc. 26.)

      After carefully reviewing the pleadings and Petitioner's state-court record, the Court concludes that Petitioner is not entitled to federal habeas corpus relief on any of the eight grounds raised in his petition.  Further, because the Court was able to resolve all grounds on the record, an evidentiary hearing is not warranted.  See Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

### I.      Background and Procedural History

      On October 8, 2013, the State of Florida charged Petitioner by amended information with four counts: sexual battery of a child between the ages of twelve

and eighteen (count one); sexual battery without serious person injury (count two); unlawful sexual activity with a minor (count three); and resisting a law enforcement officer without violence (count four).  (Doc. 23-1 at 5–6.)  A jury found Petitioner guilty as charged.  (Id. at  673–76.)[1]  Based on Petitioner's prior Colorado state conviction for sexual activity with a child, the trial court designated him a dangerous sexual felony offender and sentenced him to life imprisonment on count two (sexual battery on a child), and to time served on count four (resisting a law enforcement officer without violence.  (Id. at 664–65.)  The Fifth District Court of Appeal ("Fifth DCA") affirmed the convictions and sentences per curiam without a written opinion.  (Id. at 745.)

On April 19, 2016, Petitioner, through counsel, filed a motion for postconviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure ("Rule 3.850 Motion").  (Doc. 23-1 at 749–89.)  After holding a two-day evidentiary hearing (id. at 831–1160), the postconviction court denied all claims.  (Id. at 1161–1238.)  The Fifth DCA affirmed per curiam without a written opinion.  (Id. at 1359); Durham v. State, 291 So. 3d 581 (Fla. 5th DCA 2020).  Petitioner moved for rehearing, or alternatively, a written opinion, but the motion was denied.  (Doc. 23-1 at 1360–66, 1368.)

Petitioner timely filed this habeas petition, through counsel, on June 1, 2020.  (Doc. 1.)

---

[1] The trial court vacated counts one and three as duplicative.  (Id. at 664.)

## II.    Legal Standards

### A.    The Antiterrorism Effective Death Penalty Act (AEDPA)

Under the AEDPA, federal habeas relief may not be granted with respect to a

claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).  In this context, clearly established federal law consists

of the governing legal principles, and not the dicta, set forth in the decisions of the

United States Supreme Court at the time the state court issued its decision.  White

v. Woodall, 572 U.S. 415, 420 (2014); Carey v. Musladin, 549 U.S. 70, 74 (2006)

(citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).

A decision is contrary to clearly established federal law if the state court

either:  (1) applied a rule that contradicts the governing law set forth by Supreme

Court case law; or (2) reached a different result from the Supreme Court when faced

with materially indistinguishable facts.  Ward v. Hall, 592 F.3d 1144, 1155 (11th

Cir. 2010); Mitchell v. Esparza, 540 U.S. 12, 16 (2003).

A state court decision involves an unreasonable application of the Supreme

Court's precedents if the state court correctly identifies the governing legal

principle, but applies it to the facts of the petitioner's case in an objectively

unreasonable manner, Brown v. Payton, 544 U.S. 133, 134 (2005), or "if the state

court either unreasonably extends a legal principle from [Supreme Court] precedent

to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000) (quoting Williams, 529 U.S. at 406).

The standard to obtain relief under 28 U.S.C. §2254(d) is both mandatory and difficult to meet. To demonstrate entitlement to federal habeas relief, the petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). Moreover, when reviewing a claim under section 2254(d), a federal court must presume that any "determination of a factual issue made by a State court" is correct, and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e).

A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits and warrants deference. Ferguson v. Culliver, 527 F.3d 1144, 1146 (11th Cir. 2008). Generally, in the case of a silent affirmance, a federal habeas court will "look through" the unreasoned opinion and presume that the affirmance rests upon the specific reasons given by the last court to provide a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991); Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). However, the presumption that the appellate court relied on the same reasoning as the lower court can be rebutted "by evidence of, for instance, an alternative ground that was argued [by the state] or that is clear in the record" showing an alternative likely basis for the silent

affirmance.  Sellers, 138 S. Ct. at 1196.

### B.     Ineffective Assistance of Counsel

In Strickland v. Washington, the Supreme Court established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance.  466 U.S. 668, 687–88 (1984).  A petitioner must establish that counsel's performance was deficient and fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense.  Id.

The focus of inquiry under Strickland's performance prong is "reasonableness under prevailing professional norms."  Id. at 688.  In reviewing counsel's performance, a court must presume that "counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689 (citation omitted).  A court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," applying a highly deferential level of judicial scrutiny.  Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690).

Proving Strickland prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  466 U.S. at 687.  "Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different" had Counsel performed as Petitioner now argues he should have.  Wong v. Belmontes, 558 U.S. 15, 27 (2009) (quoting Strickland, 466 U.S. at 694).  To show prejudice in the context of a plea, the petitioner  "must show the outcome of the plea process

would have been different with competent advice." Lafler v. Cooper, 566 U.S. 156, 163 (2012); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985) ("The . . . prejudice . . . requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process") (internal quotation omitted).

## III.    Discussion

A jury found guilty on four counts, including sexual battery on a child between the ages of twelve and eighteen and resisting arrest without violence.  In addition to the victim's ("B.B.'s") testimony, the trial evidence included screen shots of text messages Petitioner exchanged with B.B. and an undercover law enforcement officer posing as B.B., as well as sexually suggestive Facebook messages sent by Petitioner to another teenage girl.  Petitioner testified at the jury trial.  Petitioner's theory of defense at trial was that all of the incriminating messages were fabricated by B.B. to retaliate against Petitioner's stepson for ending their romantic relationship.

In Grounds One through Seven of his habeas petition, Petitioner alleges ineffective assistance of trial counsel Melanie Slaughter and Charles Holloman (collectively, "Counsel").  Mrs. Slaughter represented Petitioner prior to Mr. Holloman joining her as Counsel for Petitioner.  Both defense counsel represented Petitioner at the jury trial.  (Doc. 1 at 2.)

In all events, he raised each ineffective assistance claim in his Rule 3.850 Motion, and each was denied by the postconviction court with a reasoned opinion that was affirmed by the Fifth DCA without a written opinion.  Therefore, the particular claims are exhausted, and unless noted otherwise, the Court will look

through the Fifth DCA's summary affirmance on each claim and presume that the affirmance rested upon the reasons given by the postconviction court.  Sellers, 138 S. Ct. at 1192.  Petitioner raised Ground Eight on direct appeal, and while the claim is exhausted, it, as will be explained, is dismissed pursuant to Stone v. Powell, 428 U.S. 465 (1976) without consideration of its merits.

A.    **Ground One**

Petitioner asserts that Counsel was ineffective for failing to file a motion to recuse the trial judge (Judge Brian D. Lambert).  (Doc. 1 at 5.)  He asserts that, "[a]round the time of the incident at issue," B.B.'s father told Petitioner that Judge Lambert "was a close friend of his and he had previously helped B.B. out when she got into trouble at school."  (Id.)  Petitioner claims that because he "was given one of the highest bail amounts in the history of Marion County," he believed that Judge Lambert could not be impartial should he continue to preside over his case.  (Id.) Petitioner asserts that four witnesses provided Ms. Slaughter with affidavits regarding the alleged statement from B.B.'s father, and that he begged her to file a motion for recusal.  (Id.)  When Ms. Slaughter refused to file the motion, Petitioner "hired Attorney Holloman for the sole purpose of filing the recusal motion."  (Id.) Petitioner asserts that "Holloman went so far as to draft documents to recuse Judge Lambert, but never filed the motion."  (Id.). He thus claims that both Counsel were ineffective for failing to file a motion to recuse[2] Judge Lambert.

---

[2] Under Florida law, the proper motion to ask a trial judge to recuse himself is a motion to disqualify, not motion to recuse.  To stave off any confusion, the Court tracks the language of Petitioner's petition and the postconviction court.

7

Petitioner raised this claim in his Rule 3.850 Motion, and after holding an

evidentiary hearing, the postconviction court summarized and denied the claim.  In

sum, the postconviction court found that neither Counsel was ineffective for failing

to file a motion to recuse Judge Lambert based on Petitioner's contention that

Judge Lambert had a personal relationship with B.B. or her family.  The record is

clear that Ms. Slaughter investigated the claim and determined that she did not

have a good faith basis to file a motion to recuse him in the first instance.  And

there is fair support in the record to support the postconviction court's finding that

although Mr. Holloman discussed filing a motion to recuse with Petitioner's family,

he, after his own investigation, made a tactical decision to not file one as follows:

> In his first ground, the Defendant alleges trial counsel was ineffective
> for failing to file a motion to recuse Judge Brian D. Lambert, the then-
> presiding judge.  The Defendant alleges Judge Lambert had a personal
> relationship with the victim and her family. Specifically, the
> Defendant alleges:
>
>> Around the time of the incident at issue, the Movant and
>> [Petitioner's wife] held a birthday party for [Petitioner's
>> stepson]. B.B., her family, and several other individuals
>> came to celebrate his birthday.  While at the party, B.B.'s
>> dad told the Movant in front of four other people that
>> Judge Lambert was a close family friend of his and [Judge
>> Lambert] had previously helped B.B. out when she got
>> into trouble at school.
>
> The Defendant further alleges that Judge Lambert made other
> concerning statements and set one of the highest bail amounts in the
> history of Marion County, an amount of $1,000,000. [FN1]
>
>> [FN1] The Defendant does not provide an accurate history
>> regarding his bond.  Judge Landt handled the Defendant's
>> first appearance.  Judge Landt entered an Order
>> Requiring Special Conditions of Bond in Domestic
>> Violence or Violation of Injunction Cases and set
>> Defendant's bond at "none."  Judge Lambert was actually

8

more generous with Defendant's bond than the initial judge.  Judge Lambert initially set Defendant's bond at one million dollars, but reduced Defendant's bond to $700,000.00.  Judge Lambert explained the factors he considered in setting the bond, including the serious nature of the charges, the Defendant's preexisting status as a "designated sexual offender," Defendant's prior charge of a crime of flight, and the length of the sentence the Defendant faced if convicted.  The Defendant has not demonstrated the amount of his bond was unreasonable given the court's factual findings.

The Defendant alleges he had a well-founded fear he would not receive a fair and impartial trial and thus trial counsel's failure to file a motion to recuse Judge Lambert amounted to ineffective assistance of counsel.  The Defendant's testimony at the hearing was consistent with his motion.

The Defendant's wife claimed to have heard a conversation in which the victim's father stated, "if you ever needed help, give me a call, I have a Judge, his name is Judge Lambert, and he can help you."  Her son corroborated the conversation.  The wife claims to have reported her concerns to trial counsel, Melanie Slaughter.  The Defendant's father and wife testified the family requested counsel, Slaughter, move to recuse Judge Lambert and eventually hired a second attorney, Charles Holloman, to represent the Defendant and pursue disqualification of Judge Lambert.

Holloman prepared the motion as requested, but the motion was not filed.  [Mr. Holloman] informed the father [that] counsel was comfortable with Judge Lambert presiding over the case, cautioned to "be careful what you wish for," and instructed the father he would "do what the family wanted, uh, ultimately."  The father conceded he only had second-hand knowledge of the alleged comments reported to him.  The wife conceded she did not recall why counsel told the family counsel would not be pursuing the recusal motion.  Both of them acknowledged defense counsel represented the Defendant, not the family.

. . .

Unfortunately, Defendant's motion was made more complicated in this case by the unavailability of a key witness, defense counsel, Charles Holloman (who has suffered a serious physical illness and has not been in court in more than a year), and the unavailability of counsel's notes.  However, under the unique circumstances of this case, the Court finds the Defendant has not demonstrated error or prejudice.  The

9

Defendant was represented by two board certified attorneys, Charles Holloman and Melanie Slaughter. Both attorneys had a substantial amount of experience practicing criminal law. Counsel did investigate and give serious consideration to the Defendant's allegations of bias. Trial counsel, Melanie Slaughter, did not believe there was a good faith basis to move for disqualification based on the information Defendant provided to her, [FN3] but co-counsel, Charles Holloman, who the Defendant requested assume responsibility for this issue, further investigated the issue and ultimately did not pursue disqualification.

> [FN3] Counsel [Ms. Slaughter[ testified:
>
> Q. Did you-so it was your understanding that it was like a say hello, pass in the hallway kind of relationship?
>
> A. Yes. I -- I did not have -I did not believe that it was sufficient to justify Judge Lambert recusing himself. There wasn't a personal relationship other than just like an acquaintance kind of hi, bye kind of thing.
>
> Q. And again, this is based on your understanding of what Mr. Durham told you. You didn't talk to any of the other witnesses?
>
> A. Correct. Mr. Holloman talked to those people.
>
> Counsel scheduled a meeting to meet with witnesses, but something happened that day and she was unable meet with them. Slaughter began to investigate the recusal issue, but was unable to complete an investigation before the Defendant requested Mr. Holloman pursue the issue.

Both attorneys practiced in front of Judge Lambert and both expressed confidence in Judge Lambert's capabilities and fairness. Ms. Slaughter testified she had substantial experience practicing in front of Judge Lambert and testified Judge Lambert routinely removed himself from cases in which he had a conflict. Counsels' initial assessments appeared to be sound assessments. [FN4]

> [FN4] Although Mr. Holloman, who is board certified and has a substantial amount of experience, may have had a sound basis for not pursuing disqualification, neither party presented testimony or evidence on which the court can make findings as to Mr. Holloman except that his initial assessment was sound and the court is aware of his

certification, substantial experience and the quality of his
work.

Based on the information Defendant communicated to Ms. Slaughter
and Defendant's removal of Slaughter from this portion of the case, the
Defendant failed to demonstrate error or prejudice as to Ms.
Slaughter's representation of him.  Additionally, the court finds the
Defendant did not provide testimony or evidence he timely raised this
issue with counsel at his first opportunity to do so.[FN5] Fla. R. Jud.
Admin. 2.330 (e).

> [FN5] The Defendant testified he learned that Judge
> Lambert was the judge assigned to his case "sometime
> after my first court date." He did not testify when he first
> raised the issue with counsel after he learned Judge
> Lambert was his judge.

Ground one is without merit.

(Doc. 23-1 at 1166–67 (citations to the record omitted and slight alterations made

for clarity).)  The Fifth DCA affirmed the postconviction court's denial of this claim

without a written opinion.  (Doc. 23-1 at 1359.)

Here, Petitioner claims that the state courts' rejection of this claim was based

upon an unreasonable determination of the facts in light of the evidence presented

in the state court proceeding.  (Doc. 15 at 8.) [3]  Petitioner disagrees with the

postconviction court's crediting of  Ms. Slaughter's testimony.  Petitioner contends

that Ms. Slaughter's "testimony about her recollection of the facts surrounding the

---

[3] Petitioner also asserts that the state court applied the incorrect test for
prejudice under Strickland.  (Doc. 15 at 11.)  However, this claim fails on
Strickland's deficient performance prong, and the Court will not address prejudice.
See Ward, 592 F.3d at 1163  ("[B]ecause both parts of the [Strickland] test must be
satisfied to show a Sixth Amendment violation, a court need not address the
performance prong if the petitioner cannot meet the prejudice prong, and vice-
versa.").

potential recusal issue changed several times throughout a single evidentiary hearing." (Id. at 10.)   The Court disagrees.

When it comes to factual determinations, "[s]tate court fact-findings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence." Conner v. GDCP Warden, 784 F.3d 752, 761 (11th Cir. 2015).  And a state court's credibility determination is a finding of fact.  Consalvo v. Sec'y, Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011) ("We consider questions about the credibility and demeanor of a witness to be questions of fact.").  The high measure of deference accorded to state court factual findings requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations." Marshall v. Lonberger, 459 U.S. 422, 432 (1983).  Instead, the habeas court "must conclude that the state court's factual findings lacked even fair[] support in the record." Id.  Here, there was more than fair support in the record to support the postconviction court's factual findings underpinning its determination that Counsel's lack of filing of a motion to recuse constituted deficient performance under Strickland.

Attempting to undercut the postconviction court's crediting Ms. Slaughter's testimony and its corresponding factual findings related to Counsel's failure to file a motion to recuse Judge Lambert, Petitioner contends that Ms. Slaughter's testimony changed several times throughout the Rule 3.850 evidentiary hearing. (Doc. 26 at 3–4.)  After carefully reviewing the entire evidentiary hearing transcript and each of Ms. Slaughter's statements in context, the Court does not agree.

At the Rule 3.850 evidentiary hearing, Ms. Slaughter's testimony on whether there was a good faith basis to file a recusal motion remained consistent throughout the entire hearing.  (Doc. 23-1 at 944, 973.).  Ms. Slaughter, a board-certified criminal trial lawyer who had represented thousands of criminal defendants and had tried approximately 175 jury trials at the time she represented Petitioner, (Doc. 23-1 at 942), did not think that the alleged statement at the birthday party "was sufficient to justify Judge Lambert recusing himself.  There wasn't a personal relationship other than just like an acquaintance kind of him, bye kind of thing." (Id. at 974.)

Ms. Slaughter testified that she lacked a good faith basis to file a motion to recuse, and she did not have any "basis to believe there had ever been a conversation between anybody and Judge Lambert about this defendant where this defendant would not receive a fair trial with Judge Lambert."  (Id. at 976.)  She explained that she had substantial experience in Judge Lambert court and had no questions regarding his ability to remain fair and impartial while presiding over Petitioner's case.  (Doc. 23-1 at 1166–67.)  Therefore, the record contains fair support for the credence afforded Ms. Slaughter's testimony and finding that Ms. Slaughter lacked a good faith basis to file a motion to recuse Judge Lambert based on Petitioner's allegations.

Petitioner also argues that the postconviction court's factual findings regarding Mr. Holloman's decision to not file a motion to recuse were unreasonable. (Doc. 15 at 11.)  Petitioner argues that "[t]here was no evidence that 'both' attorneys

expressed confidence in Judge Lambert's abilities to remain fair because both attorneys did not testify at the hearing, nor did Ms. Slaughter give testimony that would support that finding." (Id.)  The evidentiary hearing transcript, however, demonstrates otherwise.

As to Mr. Holloman, Danny Durham (Petitioner's father), testified that Mr. Holloman told him—referring to having another judge preside over the case—to "be careful what you wish for," and that he (Mr. Holloman) was "comfortable in Judge Lambert's courtroom[.]" (Id. at 1046.)  Moreover, Ms. Slaughter testified that <u>one</u> of the reasons Petitioner hired Mr. Holloman as co-counsel was because Mr. Holloman "indicated," that he would file a motion for recusal, (id. at 944, 977), if, after his independent investigation, he thought there was "some type of basis" to file the motion. (Id. at 945)  Specifically, Mr. Slaughter testified as follows:

> My – my understanding from my discussions with Mr.
> Holloman was that he was going to list the witnesses, and
> he was going to talk to the witnesses, and if he thought
> there was some type of basis to file a motion to recuse
> Judge Lambert, that he would do so.

(Id.)  Ms. Slaughter went on to testify that, had Mr. Holloman "found there was a basis to recuse Judge Lambert, he definitely would have filed [a motion for recusal]. But it wasn't filed by Mr. Holloman either." (Id. at 977.)  And while Petitioner now argues that Mr. Holloman "was hired solely to file the motion and he was investigating the claims, so he believed there were issues," (Doc. 26 at 4; Doc. 8 at 11), the fact remains that <u>after</u> investigating Petitioner's allegations and talking to his witnesses, Mr. Holloman proceeded to represent Petitioner at trial in Judge Lambert's courtroom without filing the motion.

Mr. Holloman could have: (1) agreed with Ms. Slaughter's assessment that there were no grounds to file a recusal motion; (2) was confident in Judge Lambert's abilities to remain fair and impartial; (3) decided against filing the motion as a strategic matter—for example, other judges may have been less desirable option to handle Petitioner's case; and/or (4) neglected to file the motion for a reason that <u>would</u> suggest ineffective assistance.

It is clear that possibilities one through three defeat Petitioner's argument because there is abundant, let alone fair, record evidence supporting the postconviction court's findings of fact as to each of these.   And even with the regrettable absence of Mr. Holloman's testimony at the Rule 3.850 evidentiary hearing, there is fair support in the record for this Court to defer to the postconviction court's findings of fact as to Mr. Holloman.

Specifically, there is evidence Mr. Holloman, like Ms. Slaughter, made an independent decision to not file a motion to recuse Judge Lambert.  This came, in part, from the postconviction court's crediting Ms. Slaughter's testimony over Petitioner's, his father's, and his wife's testimony.

Mr. Holloman's absence from the evidentiary hearing does not allow this Court to now speculate on his reasons for not filing the motion or shift the burden to the state to prove effective assistance.  "[W]here the record is incomplete or unclear about [counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment."  Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999); <u>see also</u> Kimmelman v. Morrison, 477 U.S. 365,

384 (1986) ("Counsel's competence . . . is presumed, and the [petitioner] must rebut this presumption by *proving* that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound [trial] strategy.") (emphasis added); Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of counsel's competence].").

The bottom line is that Petitioner has presented scant evidence indicating that the postconviction court's finding that two board certified criminal trial attorneys with substantial criminal law experience and familiarity with Judge Lambert investigated and made a professional decision that filing a motion to recuse him was unreasonable. And, to take it a step further, it is difficult to discern how Counsel's decisions would be deficient performance under Strickland.

Stated simply, the record supports the postconviction court's finding that both of Petitioner's attorneys independently decided against filing a recusal motion, underscoring a conclusion that a reasonable counsel could have decided to proceed to trial in Judge Lambert's courtroom under these circumstances. See Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) (noting that counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have made such a choice"). And more to the point, Petitioner has not shown that the state courts' adjudication of this claim was such that no fairminded jurists could "disagree on the correctness" of the rulings. Harrington, 562 U.S. at 101 (quotation marks omitted). This claim, in all events, simply fails under the deficient

performance prong of <u>Strickland</u>.  Ground One is therefore denied.  28 U.S.C. § 2254(d).

### B.     Grounds Two and Three[4]

In Ground Two, Petitioner asserts that Counsel was ineffective for failing to obtain a technology expert to testify that the text messages between Petitioner and B.B. "were fabricated and not accurate."  (Doc. 1 at 7.)  In Ground Three, Petitioner faults Counsel for failing to investigate his Facebook account and cellphone records to refute the testimony of another child (C.P.) who claimed to have received sexual requests from Petitioner on Facebook and to refute the validity of the text messages indicating that "B.B. was corresponding with 'the Petitioner' in a sexual manner before and after the incident."  (<u>Id.</u> at 9.)  Petitioner asserts that "[b]y investigating and establishing clearly to the jury that the text messages were completely fabricated by B.B. in an effort to destroy the Durham family, B.B.'s testimony would have been found wholly incredible."  (<u>Id.</u>)

Petitioner raised these claims in his Rule 3.850 Motion, and the postconviction court denied them on both <u>Strickland</u> prongs as follows:

> The Court is going to consider the second and third grounds together. In his second ground, the Defendant alleges trial counsel was ineffective for failing to call a "cell phone expert."  In essence, the Defendant alleges trial counsel failed to hire an expert who would have testified that he was not the sender of the explicit text messages presented at trial.  In his third ground, he alleges trial counsel was ineffective for failing to "thoroughly investigate the facts underlying

---

[4] Petitioner raised these same claims as Grounds Two and Three in his Rule 3.850 Motion, but the postconviction court addressed them together.  (Doc. 23-1 at 1167.)  To remain consistent with the postconviction court's Rule 3.850 Order, this Court will also address these claims together.

the movant's offense."  In particular, the Defendant alleged trial counsel failed to:  (1) investigate the circumstances surrounding the Facebook messages presented as <u>Williams</u> Rule evidence, and (2) investigate the Defendant's phone records.  The Defendant alleges that the Facebook messages were fabricated, as the screenshots presented at trial showed the Defendant's account as being "online," even though he was in jail at the time of the screenshots.  In addition, the Defendant alleges his cell phone records would have rebutted the victim's and the other child's testimony that the Defendant was sending explicit text messages.

The authenticity of the text messages between the Defendant and the two children was raised at trial.  The Defendant disputed the text messages and testified his Facebook account had been hacked and suggested the victim and the other child fabricated the text messages. [FN6]

> [FN6] Defendant's trial testimony was largely discounted during the prosecutor's cross examination.

At the September 7, 2018 evidentiary hearing, trial counsel, Melanie Slaughter, testified counsel investigated and explored the evidence prior to trial and was prepared to move the court for access to the Defendant's cell phone, but the Defendant stopped counsel from seeking access to his cell phone because the State of Florida would also be entitled to access to the cell phone and would "essentially dump the cell phone contents and look at everything on the cell phone."  Counsel informed Defendant that, if there was a possibility that anything on the phone would hurt his defense, it may not be in Defendant's best interest to seek access to the phone.  The Defendant "appeared to understand what he was doing" and requested counsel not pursue access to the cell phone.  Counsel did not order cell phone records or pursue an expert because of Defendant's admissions and Defendant's hesitancy in allowing law enforcement to peruse his cell phone for additional evidence.  Instead, counsel took other measures to exclude evidence, challenge the evidence, and raise a reasonable doubt. [FN7] Counsel secured a huge tactical advantage for the Defendant by securing an order from Judge Lambert keeping these records out of the State's hands.

> [FN7]  The variations in the texts colors clearly came as a surprise to counsel, but counsel used this to Defendant's advantage.  After hearing the testimony of the Defendant's expert, the trial transcript and the evidentiary hearing, the court finds that an expert would

not have changed the outcome of the proceedings, given Defendant's tactical decision to deny the State access to the phone and the other evidence implicating the Defendant.

Counsel elicited testimony from the victim and others at trial that the victim deleted a critical conversation from her text messages, was technologically savvy and had the capability to delete, alter or manipulate messages.  Counsel elicited similar testimony from the second child.  The Defendant has not demonstrated error.

Nor has the Defendant demonstrated prejudice.  The evidence against the Defendant was overwhelming.  The victim, who was an older teenage child, testified to the sexual acts.  The victim denied she manipulated or fabricated texts.  The Defendant's own words in the call recorded by Officer Hart implicated the Defendant.  The Defendant's own family members [. . .] corroborated significant portions of the victim's testimony and added context to the victim's testimony.  If anyone was fabricating testimony or evidence, the record indicates it was more likely to have been the Defendant, not the victim. Defendant's wife testified the Defendant requested she destroy the Facebook account containing the second child's text messages.  Other witnesses testified the Defendant requested assistance in destroying or engineering evidence.  The State presented recordings of the Defendant's calls from the jail which also added context to the victim's testimony and implicated Defendant in the destruction of evidence. The Defendant conceded at trial that he requested the assistance of his wife, his wife's son, and a friend to assist him in destroying evidence, fabricating evidence and securing a recantation. [FN8]  Defendant made admissions to Mr. Holloman regarding the Facebook and text messages which implicated the Defendant and resulted in the Defendant testifying in the narrative.

> [FN8]  At the evidentiary hearing, Defendant conceded he gave his password to [his wife] and requested [she] destroy his Facebook account.

Multiple witnesses testified the Defendant was engaged in texting with the victim during the time frame of the texts which the Defendant now challenges. [FN9]  Some of the most incriminating texts were actually "controlled texts" after law enforcement became involved and were sent from the victim's phone by law enforcement.  At the evidentiary hearing, the Defendant conceded he was texting the victim the night of April 1, 2013 [footnote omitted] and the victim's screen shots could have been made prior to his arrest.  Additionally, law enforcement

watched Defendant texting to Erik Dice, and Defendant admitted to law enforcement he was texting at the time of his arrest. The Defendant has simply failed to demonstrate error or prejudice in grounds two or three. Grounds two and three are thus without merit.

> [FN9] Defendant testified he never gave the victim or his wife the password to his phone. When the victim helped him with the phone application to transfer information from one phone to another, the Defendant unlocked the phone for the victim so that he could assist her.

(Doc. 23-1 at 1167–71 (citations to the record omitted and slight alterations made for clarity).) The Fifth DCA affirmed the postconviction court's denial of this claim without a written opinion. (Id. at 1359.)

Petitioner now argues that the state courts' adjudication of Ground Two "resulted in a decision that is contrary to clearly established law" under Strickland and Hinton v. Alabama, 134 S. Ct. 1081 (2014). (Doc. 15 at 12.)[5] Petitioner alleges that Counsel "failed to investigate whether a forensic expert would be a positive addition to the defense evidence. As established at the state court hearing, an expert would have been used to explain how the text and Facebook messages, which were key components of the case against the Petitioner, were falsified." (Id. at 13.) As to Ground Three, Petitioner argues that the denial of this claim was based on an

---

[5] In Hinton, the Supreme Court found that "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." 134 S. Ct. at 1089. The Court finds that Hinton is inapplicable to the facts here. There is no suggestion that Counsel was unaware that they could hire an expert witness or that Counsel failed to perform "basic research" on whether an expert witness would be helpful. Moreover, unlike the petitioner in Hinton, Petitioner has not offered any evidence through the expert witness that would have changed the outcome of this case.

unreasonable determination of the facts.  Specifically, Petitioner argues that Counsel provided "no justification" for the "strategic decision" of keeping Petitioner's phone private and that the state argued that "the phone used to text and message B.B. was the Petitioner's phone, by arguing that it was his phone number, even though there was no evidence of that."  (Id. at 16.)

At the evidentiary hearing, Petitioner offered the testimony of lawyer and forensic computer scientist John Sawicki.  (Doc. 23-1 at 842.)  Mr. Sawicki testified that the user of an electronic device enters the preferred name of a contact into their own cell phone.  (Id. at 854.)  And he agreed that only the name, and not the specific cell phone number of the sender, was displayed on the screenshots of the text messages offered into evidence by the state.  (Id. at 854–55.)  He also agreed with Petitioner's postconviction counsel that "[o]nce a conversation has taken place and is already being stored in the phone" it is possible to change the name of the contact and the change would be reflected "throughout the whole message."  (Id. at 855.)  Mr. Sawicki explained:

> [A]s far as what's being displayed on the screen, a screen shot can be an accurate representation of that.
>
> However, that data can be manipulated to be portraying something else completely different simply by altering the contact.  In addition to altering the name that's in there, you could actually put a phone number in the name blank of the address book and have a different phone number show up in the screen as well.

(Id. at 856–57.)  He also testified that, although Apple has a two-factor authentication protocol, a person could hack into someone's messaging account through any of the Apple devices that are synced to that account with just a

username and password.  (Id. at 858–59.)  But when asked by the state, Mr. Sawicki

agreed that it would be very difficult to alter the actual <u>contents</u> of a text message

and put it in a screen shot.  (Id. at 871.)  He also agreed that the identifier of a

person messaging on Facebook is not controlled by a contact list, and would not be

readily changeable.  (Id. at 871–72.)  To be clear, Mr. Sawicki did not examine

Petitioner's cell phone or cell phone records, and he did not opine that the 16-year-

old victim, the Marion County Sheriff's Office, or anybody else actually forged the

evidence in any manner.  Rather, he stated only that it was <u>possible</u> to manipulate

the "from" portion of a text message to change the sender's name or phone number.

But that theory of defense was before the jury during Petitioner's trial.  In fact, Mr.

Holloman questioned Detective Erik Dice extensively about this:

>     Q.     Have you texted with cell phones before?
>
>     A.     Yes, sir.
>
>     Q.     Okay.  So, you're somewhat familiar generically, I would – do
>            you store names in your iPhone, do you –
>
>     A.     In my cell phone.
>
>     Q.     -- I mean in your phone, cell phone?
>
>     A.     Yes, sir.
>
>     Q.     Okay.  Now, you could – when you store that name with the
>            particular number –
>
>     A.      Yes, sir.
>
>     Q.     -- like I'm going to – let's say I'm going to store the name
>            Richard Nixon in my phone and correlate it to your cell phone
>            number, when it comes up in text, it will have you as if you were
>            speaking as I'm receiving communications with Richard Nixon?
>
>     A.     Correct.

Q.   Won't it?

Q.   So, it can be manipulated to that extent; can't it?

A.   Yes, sir.

                              . . .

Q.   And part of the problem with a screen shot, a screen shot just what's on there, is a screen shot will totally pick up that misrepresentation if I program the phone that way; will it not?

A.   Possibly.

Q.   Would you like to see one?

A.   I understand what you're discussing with the name on the – on the sheet was showing Joseph Durham

     And if I'm understanding correctly, you're saying whatever name I'd put under that phone number is what would show up on the screen, in that case I would agree with you.

Q.   Or whatever they (indiscernible).

A.   Yes.

Q.   And see, that's my concern, because telephone – you'll agree with me that telephone numbers are extremely important; correct –

A.   Yes, sir.

Q.   -- the actual telephone number?  And the name that is connected to that telephone number and that would be generally for that telephone number is extremely important; correct?

A.   Yes, sir.

Q.   And what you're doing is you presented some testimony, or rather in the form of texts that certain calls went out on a certain phone which the prosecutor is saying well, that was [B.B.'s] phone and it was received by Joe Durham's phone.

     But yet I question that, because we don't have serial numbers, we don't have telephone numbers, all we've got is apparently

                              23

> what you were told to do or what was suggested to you and that
> you did on your end; correct?
>
> I'm not sure I'm 100 percent following with –
>
> Q.    I'll withdraw the question.

(Doc. 23-1 at 328–30.)  The information regarding the color of texts sent from

iPhones and Android devices was also before the jury.  During her testimony at

Petitioner's trial, B.B. explained the color differences between texts sent between

two iPhones and those sent to an iPhone from an Android phone and also explained

why the messages received from Petitioner were a different color than those she

sent to him.  (Id. at 490-92, 496–98.)   Ms. Slaughter also questioned the victim

about whether it was possible to "hack" into somebody's Facebook account and

pretend to be somebody else.  (Id. at 169–70, 494–95.)  And, while the victim

affirmed that it was possible to do so, she testified that she had never hacked a

Facebook account and denied even knowing Petitioner's email and password.  (Id.)

Petitioner testified at trial that, while he never actually gave B.B. his Facebook

password, she had access to his account through a "bump" application she would

use to install "things" on his phone.  (Id. at 445–46.)  During closing arguments, Mr.

Holloman argued for reasonable doubt on a theory that some of the texts may have

been fabricated, noting that the Petitioner's contact information was inconsistently

listed on the screenshots as Joe and Joseph.  (Id. at 583–85.)  He also pointed out

that the color of Petitioner's texts to B.B. inexplicably changed to green (from blue),

which "would mean that it's no longer iPhone to iPhone, but it's Droid or something like that that's involved." (Id. at 582.)[6]

The state court reasonably concluded that "[t]he authenticity of the text messages between the Defendant and the two children was raised at trial." (Doc. 23-1 at 1168.) Stated differently, the substance of Mr. Sawicki's testimony was before the jury through the testimony of other witness, and "[a] petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1324 n.7 (11th Cir. 2002); Rhode v. Hall, 582 F.3d 1273, 1287 (11th Cir. 2009) ("Because the evidence that Rhode faults counsel for failing to present is either inconsistent with the defense strategy or cumulative, he cannot establish ineffective assistance in counsel's failure to present it.") The state courts reasonably concluded that Petitioner is not entitled to federal habeas relief on Ground Two.

In Ground Three, Petitioner argues that Counsel should have investigated his Facebook account and cellphone records to refute the validity of the text messages. (Doc. 1 at 9.) He claims that "trial counsel should have investigated into the cell phone records of the Petitioner and B.B." (Id.) He asserts that "[o]btaining a copy of B.B.'s records as well would have revealed exactly who she was speaking

---

[6] Mr. Sawicki's testimony would have been detrimental to Petitioner on this point. Mr. Sawicki testified that, while only Apple devices could send blue text messages to other iPhones, it was also possible "for Apple devices to send text messages using the carrier portal. So those could show up in green as well." (Doc. 23-1 at 853.)

to when she was allegedly communicating with Petitioner." (Id.)  Notably,

Petitioner does not now offer this "missing" evidence to show that it would

exonerate him, nor did he do so at the evidentiary hearing on his Rule 3.850 Motion.

"Strickland places the burden on the defendant, not the State, to show a 'reasonable

probability' that the result would have been different" had Counsel performed as

Petitioner now argues he should have.  Wong, 558 U.S. at 27.  In other words, it is

Petitioner's burden on habeas review to offer the Facebook or phone records that he

claims exonerate him.  Mere speculation that favorable evidence may have existed

is insufficient to show prejudice under Strickland.   See Jones v. State, 845 So. 2d

55, 64 (Fla. 2003) ("Postconviction relief cannot be based on speculative

assertions."); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (recognizing

that vague, conclusory, speculative, or unsupported claims cannot support an

ineffective assistance of counsel claim).

   Neither has Petitioner shown deficient performance for this claim.  At the

evidentiary hearing, Ms. Slaughter testified that if the defense accessed the

contents of Petitioner's cell phone, the state would have been able to "look at

everything on the cell phone."  (Doc. 23-1 at 945.)  She advised Petitioner that "if

there was the possibility of anything that could hurt his defense in that cell phone,

it may not be in his best interest to have access to it."  (Id. at 946.)  Petitioner then

"decided not to sign the consent for the state to have access to the cell phone."  (Id.

at 947.)  Ms. Slaughter testified that Petitioner had made "certain admissions" to

Mr. Holloman "as to Facebook messages as well as text messages in this case" and

that she did <u>not</u> order phone records in the case because of Petitioner's admissions to counsel.  (Id. at 952–53.)  It is axiomatic that Counsel is not ineffective for failing to offer potentially harmful evidence at trial.  See Jackson v. Sec'y, Dep't of Corr., No. 19-11704-D, 2019 WL 8646045, at *1 (11th Cir. 2019) (counsel's decision to avoid potentially damaging evidence was "not outside the scope of what a reasonable attorney would have done") (citing Chandler, 218 F.3d at 1313).  The state courts' adjudication of Ground Three was neither contrary to <u>Strickland</u> nor based upon an unreasonable determination of the facts, and  Petitioner is not entitled to federal habeas relief.  28 U.S.C. § 2254(d).

### C.  Ground Four

Petitioner asserts that Mr. Holloman was constitutionally ineffective for conceding Petitioner's guilt as to one count during closing argument.  (Doc. 1 at 11.) Specifically, he notes that Counsel conceded that the charge of resisting an officer without violence (count four) was proven beyond a reasonable doubt.  (Id.)  He also asserts that Counsel erred by stating that Petitioner was not "innocent as the pure driven snow" and that what occurred at Petitioner's home was "sure obviously dysfunctional."  (Id.)

Petitioner raised this claim in his Rule 3.850 Motion, and the postconviction court denied it.  (Doc. 23-1 at 1171–75.)  The postconviction court found that, "[a]t no time during closing arguments did Hollomon state, imply, or even suggest that Defendant was guilty of the sexual battery charges."  (Id. at 1173.)  The court also found that, because Petitioner had nearly completed his sentence on the resisting arrest without violence (count four) during his pre-trial detention, his concession to

that misdemeanor resisting charge was a reasonable trial strategy in light of the totality of the circumstances.  (Id.)

As an initial matter, a review of Mr. Holloman's closing argument suggests that Counsel effectively conceded Petitioner's guilt to the misdemeanor resisting arrest without violence count.  (See Doc. 23-1 at 563 ("Well, I guess when you're dropping the F bomb and you're doing a lot of arguing [with a law enforcement officer], and even the defendant mentioned he was doing that, well, you're not exactly extending the olive branch of peace, are you, in a situation like that.").) Petitioner was found guilty of resisting arrest without violence, and he was sentenced by the trial court to 353 days in prison—the precise amount of pre-trial jail credit he was awarded.  (Id. at 681.)  But, at the time of Petitioner's trial, a concession to a misdemeanor count tried along with a life felony count—even absent a defendant's permission—could be considered sound trial strategy because a concession, in light of overwhelming evidence, could foster trust with a jury.  See McNeal v. Wainwright, 722 F.2d 674, 676 (11th Cir. 1984) (finding that McNeal's attorney's statements conceding manslaughter during a murder trial were tactical and strategic and did not constitute a forced guilty plea); Underwood v. Clark, 939 F.2d 473, 474 (7th Cir. 1991) (concluding that defense counsel's concession during closing arguments of a lesser included offense was "a sound tactic when the evidence is indeed overwhelming . . . and when the count in question is a lesser count, so that there is an advantage to be gained by winning the confidence of the jury").  And based on Petitioner's admissions during his testimony regarding his

actions during his arrest (Doc. 23-1 at 425–29, 432), the postconviction court reasonably concluded that Mr. Holloman's concession to that misdemeanor charge, where Petitioner had already served only two days below the 365-day statutory maximum for that conceded-to count was a matter of sound trial strategy that could not have prejudiced him.

Petitioner contends that Mr. Holloman's concession of guilt to the resisting charge was contrary to the holding in McCoy v. Louisiana, 138 S. Ct. 1500 (2018). In McCoy, the Supreme Court determined that it violates a criminal defendant's Sixth Amendment right to assistance of counsel if defense counsel concedes the defendant's guilt over his express objection, even if doing so is a matter of sound trial strategy.  138 S. Ct. at 1505 ("[I]t is the defendant's prerogative, not counsel's, to decide on the objective of his defense:  to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt.").  However, McCoy does not entitle Petitioner to a new trial on the resisting without violence charge.  McCoy was decided more than four years after Petitioner's trial.  Petitioner does not now argue that McCoy applies retroactively to cases on collateral review, and the courts of appeal that have addressed the case have not held it to be retroactive.  See Christian v. Thomas, 982 F.3d 1215, 1224–25 (9th Cir. 2020) (holding that McCoy does not apply retroactively); Smith v. Stein, 982 F.3d 229, 235 (4th Cir. 2020) ("We hold that the rule announced in McCoy v. Louisiana, is not retroactively applicable on collateral review.")  Moreover, even though McCoy was decided *before* the postconviction

court's order on his Rule 3.850 Motion, Petitioner did not update his motion to raise this issue in state court (although he did cite McCoy in his brief on appeal of the Rule 3.850 Order).  He has not argued cause or prejudice for his failure to do so. Accordingly, even if McCoy applied retroactively, Petitioner did not exhaust a McCoy claim, and to the extent Ground Four relies on McCoy, in addition to being denied on the merits, it must be dismissed as unexhausted.  See 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State[.]")

The postconviction court reasonably concluded that Mr. Holloman did not concede Petitioner's guilt to any other charges.  (See Doc. 23-1 at 1173 ("At no time during closing arguments did Holloman state, imply, or even suggest the Defendant was guilty of the sexual battery charges.").)  To the contrary, Mr. Holloman stressed that, even if the jurors thought Petitioner "had something to do with that girl," they could not convict him unless the state proved his guilt "beyond and to the exclusion of every single reasonable doubt."  (Id. at 566–67.)  Counsel admitted that there was significant "underlying controversy in this case, affairs and things like that, all this crazy stuff, every bit of it," (id. at 567), and stated that he was not going to argue that Petitioner was "innocent as the pure driven snow" (Id. at 568.)  But he immediately clarified that "what I'm saying is this, is that the proof does not rise to the level beyond and to the exclusion of every single reasonable doubt." (Id.)  He

noted that B.B.'s relationship with Petitioner's family was "sure obviously dysfunctional" (id. at 570) and that Petitioner was "dragged" into an "unfortunate position." (Id.) Counsel conceded that Petitioner had done some stupid things after his arrest (such as sending letters to a friend asking him to pretend to be B.B. and recant the accusations), but argued that Petitioner did so "because he was desperate, because he knows what he's facing.  Because he's, as he maintained all during those letters, you didn't hear anything that sounded like a confession in those letters[.]" (Id. at 576.)  Mr. Holloman then compared the evidence of the sex charges with that for the resisting charge:

> And I submit to you very respectfully that if you do, you're going to find this quite honestly, you're going to find this, it's a closed case.  I'm going to tell you that right now.  I'll be frank with you, it's a closed case, but they have not gone far enough.  I would submit, to where it can be said that it's proven beyond and to the exclusion of every reasonable doubt.
>
> So, did he ever have a sex act with her?  No.  Under the Statute, no.  You don't even get to the issue of consent.
>
> In contradistinction of that, look at that resisting charge. Look at the resisting charge.  Is it proven beyond and to the exclusion of every single reasonable doubt?
>
> You bet it is, you bet, that's a case that's crystal clear. The dynamics of it are controlled, the testimony is credible and the evidence is there.

(Id. at 588.)  Mr. Holloman did characterize some of Petitioner's actions as dysfunctional and noted that he was not "pure as the driven snow." But these statements—read in context of counsel's entire closing argument—were not a concession of guilt to the child sex charges.  They were instead a recognition of the

evidence presented at trial regarding Petitioner's parenting style and his attempts after his arrest to get his friends and family members to tamper with evidence. Petitioner was not on trial for any of those actions, and reasonable competent counsel could have chosen to recognize Petitioner's mistakes while simultaneously arguing that he did not coerce or force sexual relations with a child. The state courts' adjudication of this claim was neither contrary to <u>Strickland</u> nor based upon an unreasonable determination of the facts. Petitioner is therefore not entitled to federal habeas relief on Ground Four. 28 U.S.C. § 2254(d).

### D.    Ground Five

Petitioner asserts that Counsel was ineffective for failing to call Deputy Elizabeth Hart to testify at trial. (Doc. 1 at 13.) He asserts that Deputy Hart would have testified that she witnessed B.B. delete critical text messages she received from Petitioner, "therefore informing the jury firsthand that B.B. was guilty of destroying evidence in the instant case." (Doc. 15 at 19.) He asserts that it would have shown the jury that B.B. could not be trusted. (Id.) He also asserts that "[t]he fact that the initiating officer was involved in the deletion of material evidence would have shown the jury that the case was not investigated completely, and any investigation done was done so with bias and prejudice against the Petitioner." (Id.)

Petitioner raised this claim in his Rule 3.850 Motion, and the postconviction court denied it on the ground that Petitioner "has not demonstrated witness availability, error, or prejudice [from] counsel's failure to call Deputy Hart at trial." (Doc. 23-1 at 1177.) Petitioner asserts, without explanation, that "this finding was based on an unreasonable determination of the facts." (Doc. 15 at 20.) However,

upon careful review of the entire trial and evidentiary hearing transcripts, the Court rejects Petitioner's assertion.

At the evidentiary hearing on Petitioner's Rule 3.850 Motion, Deputy Hart testified that she was in a rehabilitation hospital recovering from an accident during Petitioner's trial.  (Doc. 23-1 at 1105–06.)  Therefore, she would not have been available to testify.  (Id. at 1117.)   She stated that she became involved in the case when B.B., who was a personal friend, told her about an incident with Petitioner.  (Id. at 1106.)  She observed B.B. delete some messages from her phone, so she "discouraged her from deleting any further messages and took the phone." (Id. at 1110.)  Reading from her police report, Deputy Hart stated that she "saw two text messages that came from – allegedly came from the defendant, one which stated the suspect would not go back to prison.  That's in my report, the statement in my report. . . And in another the statement the suspect advised that he would kill himself."  (Id. at 1113.)   Deputy Hart did not testify at the Rule 3.850 evidentiary hearing about Facebook or B.B.'s alleged ability to manipulate data.  At trial, B.B. testified that she was "like [Deputy Hart's] little sister so she knows when I'm upset" (id. at 73, 80) and that Deputy Hart reported the incident to law enforcement.  (Id. at 74.)   B.B. admitted at trial to deleting some of Petitioner's text messages when she was with Deputy Hart.  (Id. at 491.)

Given that it is undisputed that Deputy Hart was unavailable to testify at Petitioner's trial and given that she provided no new evidence at the evidentiary hearing that would have been helpful to Petitioner in the first instance, the state

33

courts' conclusion that Petitioner could not show prejudice from Counsel's failure to call Deputy Hart as a witness was neither contrary to Strickland nor based upon an unreasonable determination of the facts.  Petitioner is not entitled to federal habeas corpus relief on Ground Five.

### E.    Ground Six

Petitioner asserts that Counsel was ineffective for not investigating his competency to stand trial.  (Doc. 1 at 14.)  He asserts that he has "been diagnosed with borderline personality disorder, bipolar disorder, manic depressive disorder, delusions, post-traumatic stress disorder, and Asperger's syndrome."  (Id.).  He asserts that he "has been prescribed antipsychotic medication because of his violent outbursts and wild mood swings," yet "was never evaluated or questioned about his competency."  (Id.)

Petitioner raised this claim in his Rule 3.850 Motion, and the postconviction court rejected it after holding an evidentiary hearing.  In its order, the postconviction court explained that to prove ineffective assistance, Petitioner had to show that "a reasonably competent attorney could have questioned the defendant's competence to proceed."  (Doc. 23-1 at 1177–78 (citing Thompson v. State, 88 So. 3d 312, 319 (Fla 4th DCA 2012)).)  The postconviction court also explained that Petitioner was required to "set forth clear and convincing circumstances creating a real, substantial and legitimate doubt as to his competency."  (Id.)  And under Florida law, [a] defendant will meet the criteria for competence to proceed if [he] 'has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and . . . the defendant has a rational, as well as factual,

understanding of the pending proceedings.' " (Doc. 23-1 at 1178 (quoting Fla. R.

Crim. P. 3.211(a)(1)).)  After summarizing the evidentiary hearing testimony from

Petitioner, Petitioner's wife, Petitioner's father, and Ms. Slaughter on this issue, the

postconviction court denied the claim as follows:

> Given the testimony presented at the two evidentiary hearings, the
> Court finds there is no real, substantial and legitimate doubt as to
> Defendant's competency.  The Defendant was articulate, manifested
> appropriate courtroom behavior and testified relevantly at both his
> trial and the evidentiary hearing.  Although the Defendant may suffer
> from mental health issues, that does not make one incompetent.  The
> testimony established the Defendant is intelligent, understood the
> charges against him and the nature of the proceedings, disclosed
> pertinent facts, consulted with both Slaughter and Holloman, sought a
> second legal opinion when appropriate, and assisted counsel in
> mounting a defense.  A reasonably competent attorney would not have
> questioned the defendant's competency to proceed.  The Court finds
> Slaughter was not ineffective in failing to request a competency
> evaluation on Defendant's behalf.  Ground Six is without merit.

(Doc. 23-1 at 1180.)  The Fifth DCA affirmed without a written opinion.  (Id. at

1359.)  Petitioner now argues that the state courts' adjudication of this claim was

based upon an unreasonable determination of the facts because Petitioner "acted

erratic, consistently acted in a manner that would hurt his chances of proving his

innocence (even after he was advised by counsel to act otherwise), and ultimately

could not assist in his defense." (Doc. 15 at 21.)  However, a review of the entire

supports for the postconviction court's findings and legal conclusion.

Specifically, a review of Petitioner's trial testimony demonstrates that

Petitioner testified during trial in a clear and coherent narrative without guidance

or interference from Counsel.  (Doc. 23-1 at 395–473.)[7]  During both his trial direct

_____

[7] Ms. Slaughter testified at the evidentiary hearing that Petitioner testified

testimony and the state's cross-examination, Petitioner denied that he had sexual relations with B.B. (but alleged that she attempted to seduce him), admitted that he had asked others to harass B.B., destroy evidence, and to manufacture exculpatory evidence, but asserted that he acted out of panic and desperation.  Nothing in his narrative direct testimony or in his testimony on cross-examination suggested that Petitioner did not understand the proceedings or that he was unable to  "consult with counsel with a reasonable degree of rational understanding."  Fla. R. Crim. P. 3.211(a)(1).

Likewise, during the Rule 3.850 evidentiary hearing testimony, Petitioner admitted that he was quite involved in his case—asking Counsel to file a motion for recusal (and collecting affidavits to support the motion), seeking an expert to refute the authenticity of the text and Facebook messages, and hiring second counsel when he felt that Ms. Slaughter was not sufficiently engaged in his case.  (See Doc. 23-1 at 886–905.)  And while he testified that he was diagnosed with mental-health issues as a child and teenager, (id. at 906–08), and that he was diagnosed with post-traumatic stress disorder while in prison in Colorado, he did not offer any recent psychological diagnoses or other medical evidence suggesting that he was actually incompetent during his trial.[8]  He admitted that he was not on psychiatric

---

in the narrative because he had admitted some of the sex acts to Mr. Holloman and that Mr. Holloman could not "have [Petitioner] give responses that were contrary to his earlier discussions with him."  (Doc. 23-1 at 965–66.)

[8] He testified that he sometimes would get "fixated" on things and "because of the lack of communication with [his] attorneys, that it caused [him] to have very, very angry outbursts towards my family and over the phone" which had a negative impact on his case.  (Doc. 23-1 at 910.)  This, standing alone, does not rise to the

medication while awaiting trial and had not received mental health counseling since the age of 15 or 16.  (Id. at 926.)

The record evidence does not approach the threshold of raising a bona fide doubt about (or suggest that reasonable competent counsel would have questioned) Petitioner's competency to proceed to trial.  See Sheley v. Singletary, 955 F.2d 1434, 1438 (11th Cir. 1992) ("Due process requires that an adequate hearing be held on competency when the evidence raises a 'bona fide doubt' as to [a] defendant's competency to stand trial."); Pate v. Robinson, 383 U.S. 375, 385-86 (1966) explaining that a trial judge must conduct a sua sponte sanity hearing only when the defendant's conduct and the evidence raises a "bona fide doubt" regarding the defendant's competence to stand trial).

Moreover, under Strickland, even if Counsel's failure to raise the issue of competence was unreasonable—a finding not made by this Court—Counsel's performance would be constitutionally ineffective only upon a showing of prejudice, which requires evidence that Petitioner was actually incompetent during the relevant time period.  See Futch v. Dugger, 874 F.2d 1483, 1487 (11th Cir. 1989) (stating in the context of an ineffective assistance claim that "[i]n order to demonstrate prejudice from counsel's failure to investigate his competency, [a] petitioner has to show that there exists 'at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial.' "(quoting Alexander v. Dugger, 841 F.2d 371, 375 (11th Cir. 1988))).

---

level of incompetency under any federal or state standard.

Petitioner offered no testimony from a physician or mental health professional suggesting that he was incompetent to stand trial <u>in 2014</u>, and evidence of the mental illness diagnoses he received as a child or his self-serving testimony about his angry outbursts to his family are insufficient to show that he was actually incompetent to stand trial in this case.  Petitioner has not shown that the state courts' adjudication of this claim was contrary to <u>Strickland</u> or based upon an unreasonable determination of the facts.  He is also not entitled to federal habeas corpus relief on Ground Six.

### F.    Ground Seven

Petitioner asserts that he was offered a plea agreement of ten years' imprisonment, but the offer "was revoked before he could accept or deny it because Ms. Slaughter went on vacation before bringing all pertinent facts to his attention." (<u>Doc. 1 at 16</u>.)  He asserts that Ms. Slaughter advised him that "the State was making a ten (10) year plea offer, but did not give the Petitioner any other facts or guidance about the strength of the plea/case in general.  Instead, counsel went on vacation for over a week and ignored all of the Petitioner's phone calls." (<u>Doc. 15 at 23</u>.)  He contends that, while Ms. Slaughter was gone, he called her office numerous times, and that those calls prompted the state to withdraw the offer before Ms. Slaughter returned.  (<u>Doc. 1 at 16</u>.)  He further contends that he was unaware that he could receive a life sentence if he lost at trial and that, had he been aware of his sentencing exposure, he would have accepted the state's subsequent offers of 17 or 25 years.  (<u>Doc. 1 at 16</u>; <u>Doc. 15 at 23</u>–24.)

Petitioner raised Ground Seven in his Rule 3.850 Motion, and after holding

an evidentiary hearing at which both Petitioner and Ms. Slaughter testified, the

court denied the claim as follows:

> At the September 7, 2018 evidentiary hearing, the Defendant testified
> he did not become aware he faced a life sentence until sometime in
> October 2013 when he was fingerprinted.  Defendant conceded the
> Jimmy Ryce Act affected his willingness to entertain any plea offer
> from the State of Florida. Defendant postulated he would have
> "considered (the State's offers) more" had counsel informed him he
> faced a life sentence, but Defendant conceded "at the time (he was)
> more stubborn on my-on my innocence and I didn't want to take any
> type of deals, especially 25 years."
>
> The Court finds trial counsel to be more credible regarding the issues
> raised in ground eight.  Trial counsel testified the State of Florida did
> not initially charge the Defendant with a life offense.  On October 3,
> 2013, the State of Florida filed their amended information adding the
> language the Defendant "having been previously convicted in Colorado
> of Sexual Assault on a Child on August 27, 1997, qualifying him to be
> sentenced as a Dangerous Sexual Felony Offender pursuant to
> 794.0115."  Slaughter testified the prosecutor did not inform her he
> would be pursuing a life sentence until the prosecutor filed the
> amended information.  Slaughter agreed the Defendant would not have
> known he was exposed to a life sentence until the State filed their
> amended information, but that counsel immediately informed the
> Defendant he faced a life sentence when the State of Florida filed an
> amended information.  Slaughter testified she secured a ten-year
> prison plea offer for the Defendant prior to Mr. Holloman's
> introduction into the case.  Counsel scheduled a hearing on the
> Defendant's behalf to memorialize the offer and the Defendant's
> acceptance or rejection of the offer in court.  The State was unwilling to
> offer the Defendant a plea to an offense that was not a sex crime
> subject to possible Jimmy Ryce proceedings.  Trial counsel testified the
> Defendant rejected the State's offer because counsel could not promise
> the Defendant he would not be involuntarily civilly committed for the
> rest of his life.  The Court finds the Defendant was unwilling to
> entertain the State's offers and failed to demonstrate error or
> prejudice.

(Doc. 23-1 at 1181–82 (internal citations to the record omitted).)  The Fifth DCA

affirmed without a written opinion.  (Doc. 23-1 at 1359.)  Other than stating,

without elaboration, that the state court's rejection of this claim was "unreasonable," (doc.15 at 24), Petitioner does not explain why he is entitled to habeas corpus relief on Ground Seven.

The Court found Ms. Slaughter's testimony to be credible and specifically concluded that Petitioner was not willing to accept the state's plea offers.  As discussed in Ground One, findings of fact—including credibility determinations—are entitled to a presumption of correctness.  And this Court will not redetermine the credibility of witnesses when the testimony and demeanor of those witnesses has been observed in state court, but not here.  See Consalvo, 664 F.3d at 845 ("Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review.")  And there is evidence in the record to support the state courts' factual findings.

Specifically, Petitioner admitted at the evidentiary hearing that he rejected offers from the state because he was "worried about . . . something called the Jimmy [Ryce] Act or something to that -- to that nature that somebody had made aware of me." (Doc. 23-1 at 902.)  He testified that "at the time [he was] stubborn on [his] innocence and . . . didn't want to take any type of deals, especially 25 years." (Id. at 904.)  Ms. Slaughter testified at the Rule 3.850 evidentiary hearing that Petitioner was advised of the state's ten-year offer, but rejected it because of the potential for involuntary civil commitment after the prison sentence was complete.  (Id. at 963–64.)  She stated, "I think if the state had offered him something that wasn't a sex offense, it probably would have been resolved, but [the state was] not willing to do

that." (Id. at 964.)  From this testimony, the postconviction court could reasonably conclude that Petitioner rejected the state's plea offers because he did not want to risk lifetime involuntary civil commitment and not because he was unaware of his sentencing exposure.  And this conclusion was sufficient for the state courts to determine that Counsel was not ineffective during the plea process.  Petitioner is not entitled to federal habeas relief on Ground Seven.  28 U.S.C. § 2254(d).

### G.   Ground Eight

Petitioner asserts that the admission of the screen shots of text messages was contrary to clearly established federal law.  (Doc. 1 at 17.)  He notes that the police did not obtain a search warrant to search his cell phone—rather, they obtained the screen shots of text messages from B.B.'s cell phone.  (Id.)  He asserts that "[w]hen the contents of a cell phone are obtained without a warrant, a violation of the user's Fourth Amendment rights has occurred."  (Doc. 15 at 24.)

Here, Respondent recognizes that Petitioner exhausted this claim, but argues that he is not entitled to federal habeas review because he had a full and fair opportunity to litigate this claim in state courts.  (Doc. 21 at 46.)  Indeed, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  Stone, 428 U.S. at 494 (footnotes omitted).  Thus, for this Court to review the merits of Petitioner's Fourth Amendment claim, he must demonstrate that the state courts deprived him of a full and fair opportunity to litigate the claim.

In Tukes v. Dugger, 911 F.2d 508, 513-14 (11th Cir. 1990), the Eleventh

Circuit addressed the Stone requirement for a "full and fair" opportunity to litigate

a Fourth Amendment claim and explained:

> For a claim to be fully and fairly considered by the state courts, where
> there are facts in dispute, full and fair consideration requires
> consideration by the fact-finding court, and at least the availability of
> meaningful appellate review by a higher state court.  Where, however,
> the facts are undisputed, and there is nothing to be served by ordering
> a new evidentiary hearing, the full and fair consideration requirement
> is satisfied where the state appellate court, presented with an
> undisputed factual record, gives full consideration to defendant's
> Fourth Amendment claims.

Id. at 514.  Petitioner's Fourth Amendment claim was raised on direct appeal. There

were no facts in dispute, and there was nothing to suggest that the appellate court

did not fully consider this claim before denying relief.   (Doc. 23-1 at 727–31, 744.)

Thus, Petitioner was afforded a full and fair opportunity to litigate his Fourth

Amendment claim in state court.  He is not permitted to further litigate Ground

Eight in this Court, and the claim is denied.

## IV.   Conclusion

Based on the foregoing, Petitioner is not entitled to relief on the habeas

claims presented here.[9]

Accordingly, it is ordered that:

1.      The 28 U.S.C. § 2254 petition filed by Joseph Durham is **DENIED**.

---

[9] Even if not specifically enumerated in this order, all allegations raised in
the petition have been carefully considered by the Court.  At bottom, no allegation
warrants habeas relief.

2.      The Clerk is **DIRECTED** to enter judgment in favor of Respondent
and against Petitioner, deny any pending motions as moot, terminate
any deadlines, and close this case.

### Certificate of Appealability[10]

A prisoner seeking a writ of habeas corpus has no absolute entitlement to
appeal a district court's denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a
district court or circuit justice or judge must first issue a certificate of appealability
(COA).  "A [COA] may issue . . . only if the applicant has made a substantial
showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make
this substantial showing,  a petitioner "must demonstrate that reasonable jurists
would find the district court's assessment of the constitutional claims debatable or
wrong,"  Slack v. McDaniel, 529 U.S. 473, 484 (2000), or that "the issues presented
are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell,
537 U.S. 322, 336 (2003).  When, as here, the district court has rejected a claim on
procedural grounds, the petitioner must show that "jurists of reason would find it
debatable whether the petition states a valid claim of the denial of a constitutional
right and that jurists of reason would find it debatable whether the district court
was correct in its procedural ruling."  Slack, 529 U.S. at 484.

Upon consideration of the record, the Court declines to issue a COA.  Because
Petitioner is not entitled to a COA, he is not entitled to appeal in forma pauperis.

---

[10] Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the
United States District Courts, the "district court must issue or deny a certificate of
appealability when it enters a final order adverse to the applicant."

**DONE AND ORDERED** in Ocala, Florida on August 24, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

SA:  FTMP-2

Copies furnished to:
Counsel of Record
Unrepresented Parties